Slip Op. 17-173

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | |
| Plaintiff, | |
| v. | Before: Gary S. Katzmann, Judge |
| UNITED STATES, | Court No. 16-00238 |
| Defendant, | **PUBLIC VERSION** |
| and | |
| STEEL DYNAMICS, INC., et.al., | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Commerce's <u>Final Results</u> are sustained.]

Dated: December 27, 2017

<u>J. David Park</u> and <u>Henry D. Almond</u>, Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for plaintiff.  With them on the brief was <u>Daniel R. Wilson</u> and <u>Sylvia Y. Chen</u>.

<u>Patricia M. McCarthy</u>, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Renee A. Burbank</u>, Senior Trial Counsel.  Of counsel was <u>Lydia Pardini</u> and of counsel on the brief was <u>Christopher Hyner</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Paul C. Rosenthal</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for defendant-intervenor, ArcelorMittal USA LLC.  With him on the joint response brief were <u>Roger B. Schagrin</u> and <u>Christopher T. Cloutier</u>, Schagrin & Associates, of Washington, DC, for defendant-intervenor, Steel Dynamics, Inc.; <u>Stephen A. Jones</u> and <u>Daniel L. Schneiderman</u>, King & Spalding, LLP, of Washington, DC, for defendant-intervenor, AK Steel Corporation; <u>Jeffrey D. Gerrish</u> and <u>Luke A. Meisner</u>, Skadden Arps Slate Meager & Flom, LLP, of Washington, DC, for defendant-intervenor, United States Steel Corporation; and <u>Alan H. Price</u>, <u>Timothy C. Brightbill</u> and <u>Chris B. Weld</u>, Wiley Rein LLP, of Washington DC, for defendant-intervenor, Nucor Corporation.

Katzmann, Judge:  What is the extent of the responsibility of a respondent company to develop the administrative record upon which the United States Department of Commerce ("Commerce") bases its final determination in an antidumping duty investigation?  What is the extent of Commerce's authority to apply adverse inferences to a respondent who has not developed the record?  May Commerce, in accordance with law, deny a constructed export price offset when such an adjustment had been previously granted to the same company in similar, but not identical, circumstances?  These questions are now before the court.

Plaintiff Hyundai Steel Company ("Hyundai") challenges the final determination of sales at less-than-fair-value in the antidumping investigation by Commerce in Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 81 Fed. Reg. 53,419 (Dep't Commerce Aug. 12, 2016) ("Final Results").    In particular, Hyundai contends that Commerce should not have applied adverse facts available ("AFA") in adjusting Hyundai's reported expenses with respect to its transactions with certain affiliated companies.  Hyundai further argues Commerce should have granted a constructed export price offset -- in other words, Commerce should have made adjustments commensurate with differences between Hyundai's selling activities in the Korean and U.S. markets as part of its analysis.  The court finds neither of these contentions persuasive, and sustains Commerce's determination.

## BACKGROUND

### I.    Legal Background

Pursuant to United States antidumping law, Commerce must impose antidumping duties on subject merchandise that "is being, or is likely to be, sold in the United States at less than fair value" and that causes material injury or threat of material injury to a domestic industry.  19 U.S.C.

§ 1673 (2012).[1]  "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States)."  Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1326 (Fed. Cir. 2017).  Normal value is defined as "the price at which the foreign like product is first sold . . . in the exporting country [i.e., the home market]." 19 U.S.C. § 1677b(a)(l)(B)(i).  Here, "normal value" refers to the price of Hyundai's hot-rolled steel sold in Korea.  Export price, or constructed export price ("CEP"), means the price at which the subject merchandise is first sold to an unaffiliated purchaser in the United States.  19 U.S.C. § 1677a(a)–(b).  Commerce uses CEP when a seller affiliated[2] with the producer makes the first sale to an unaffiliated purchaser in the United States. 19 U.S.C. § 1677a(b).

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2017 edition.  The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015).  The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding.  See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

[2] Per 19 U.S.C. § 1677(33), affiliated entities are:

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> (B) Any officer or director of an organization and such organization.
> (C) Partners.
> (D) Employer and employee.
> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
> (G) Any person who controls any other person and such other person.

When making a comparison between export price, or CEP, and normal value, Commerce seeks

to ensure that a producer's costs are reflective of the market value of those goods or services, and

may adjust both values.  See 19 U.S.C. § 1677b(a), (b).  Companies sometimes use affiliated

companies to provide services like shipping, insurance, and other similar services for both home

market sales and United States sales.  Because of the companies' affiliation, the costs may be

distorted and not reflect the true market price of those services.  Therefore, when a party sells its

goods by using services from an affiliated company, Commerce must determine whether the

transactions with the affiliated company were made at arm's-length, or comparable to transactions

conducted with an unaffiliated party.  For home market sales, if a party cannot establish that a

transaction with the affiliated party was made at arm's-length, Commerce may make an "arm's-

length adjustment."  See 19 U.S.C. § 1677b(b) (permitting Commerce to determine whether home

market sales are distorted); 19 U.S.C. § 1677b(f)(2) ("A transaction directly or indirectly between

affiliated persons may be disregarded if . . . the amount representing that element does not fairly

---

For purposes of this paragraph, a person shall be considered to
control another person if the person is legally or operationally in a
position to exercise restraint or direction over the other person.

Commerce's regulation 19 C.F.R. § 351.102(b)(3) further provides that:

"Affiliated persons" and "affiliated parties" have the same meaning
as in [§ 1677(33)].  In determining whether control over another
person exists, within the meaning of [§ 1677(33)], [Commerce] will
consider the following factors, among others: Corporate or family
groupings; franchise or joint venture agreements; debt financing;
and close supplier relationships.  [Commerce] will not find that
control exists on the basis of these factors unless the relationship has
the potential to impact decisions concerning the production, pricing,
or cost of the subject merchandise or foreign like product.
[Commerce] will consider the temporal aspect of a relationship in
determining whether control exists; normally, temporary
circumstances will not suffice as evidence of control.

reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."); 19 C.F.R. § 351.402(e) (2015).[3]

Information that producer respondents submit to Commerce during an investigation is subject to verification.  See 19 U.S.C. § 1677m(i)(1).[4]

### A.   Adverse Facts Available

When either necessary information is not available on the record, or a respondent (1) withholds information that has been requested by Commerce, (2) fails to provide such information by Commerce's deadlines for submission of the information or in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4) provides information that cannot be verified, then Commerce shall "use the facts otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a).  This subsection thus provides Commerce with a methodology to fill informational gaps when necessary or requested information is missing from

---

[3] 19 C.F.R. § 351.402(e) provides:

> Treatment of payments between affiliated persons. Where a person affiliated with the exporter or producer incurs any of the expenses deducted from constructed export price under [19 U.S.C. § 1677a(d)] and is reimbursed for such expenses by the exporter, producer or other affiliate, [Commerce] normally will make an adjustment based on the actual cost to the affiliated person. If [Commerce] is satisfied that information regarding the actual cost to the affiliated person is unavailable to the exporter or producer, [Commerce] may determine the amount of the adjustment on any other reasonable basis, including the amount of the reimbursement to the affiliated person if [Commerce] is satisfied that such amount reflects the amount usually paid in the market under consideration.

All citations to Title 19 of the Code of Federal Regulations are to the official 2015 edition.

[4] 19 U.S.C. § 1677m(i)(1) provides: "The administering authority shall verify all information relied upon in making a final determination in an investigation."

the administrative record.  See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed.

Cir. 2003).

Commerce "may use an inference that is adverse to the interests of that party in selecting

from among the facts otherwise available" ("AFA"), if it "finds that an interested party has failed

to cooperate by not acting to the best of its ability to comply with a request for information[.]" Id.

§ 1677e(b)(1)(A).  A respondent's failure to cooperate to "the best of its ability" is "determined

by assessing whether [it] has put forth its maximum effort to provide Commerce with full and

complete answers to all inquiries."  Nippon Steel, 337 F.3d at 1382.

When applying an adverse inference, Commerce may rely on information from the petition,

a final determination in the investigation, a previous administrative review, or any other

information placed on the record. 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)(2).   If

Commerce uses an adverse inference under § 1677e(b)(1)(A) in selecting among facts otherwise

available, Commerce is not required to demonstrate that the dumping margin used "reflects an

alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3).

Commerce has explained the rationale behind its AFA policy:

> [Commerce's] practice when selecting an adverse rate from among
> the possible sources of information is to ensure that the result is
> sufficiently adverse "as to effectuate the statutory purposes of the
> AFA rule to induce respondents to provide the Department with
> complete and accurate information in a timely manner."

Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States, 41 CIT ___, ___, 2017 WL 4651903, at *5

(Ct. Int'l Trade 2017) (citations omitted).  Commerce maintains that its practice also ensures "that

the party does not obtain a more favorable result by failing to cooperate than if it had cooperated

fully." Id. (quoting Statement of Administrative Action, accompanying the Uruguay Round

Agreements Act, H.R. No. 103–316, vol. 1, at 870 (1994), reprinted in 1994 U.S.C.CAN. at 4199

("SAA"));[5] compare 19 U.S.C. § 1677e(d)(3).

### B.    CEP Offset

Commerce may also adjust the normal value to take into account differences in the level

of trade between the home market and U.S. market to "reconstruct the price at a specific, 'common'

point in the chain of commerce, so that value can be fairly compared on an equivalent basis."

Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303 (Fed. Cir. 2001) (quoting Koyo Seiko

Co. v. United States, 36 F.3d 1565, 1568 (Fed. Cir. 1994)); see 19 U.S.C. § 1677b(a)(1)(B).  Level

of trade adjustments are made when the difference in the level of trade (i) involves the performance

of different selling activities; and (ii) demonstrably affects price comparability, based on a pattern

of consistent prices differences between the sales at the different levels of trade.   19 U.S.C.

1677b(a)(7)(A); see Micron, 243 F.3d at 1303 (quoting Koyo Seiko Co. v. United States, 36 F.3d

at 1568).

In cases where "normal value is established at a level of trade which constitutes a more

advanced stage of distribution than the level of trade of the constructed export price, but the data

available do not provide an appropriate basis to determine . . . a level of trade adjustment," a CEP

offset will be appropriate, and the "normal value shall be reduced by the amount of indirect selling

expenses incurred in the country in which normal value is determined on sales of the foreign like

product but not more than the amount of such expenses for which a deduction is made under

section 1677a(d)(1)(D)."  19 U.S.C. § 1677b(a)(7)(B).  "The effect is to reduce the price of the

---

[5] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

more advanced level of trade by 'indirect selling expenses' that have been included in the price on the apparent theory that such costs would not have been incurred if the sale had been made on a less advanced level of trade." Micron, 243 F.3d at 1305.

According to the SAA, the foreign exporter must supply evidence that "the functions performed by the sellers at the same level of trade in the U.S. and foreign markets are similar, and that different selling activities are actually performed at the allegedly different levels of trade" to qualify for a CEP offset.  SAA at 829.  Although neither the statute nor the SAA defines "same level of trade," the phrase is understood "to mean comparable marketing stages in the home and United States markets, e.g., a comparison of wholesale sales in Korea to wholesale sales in the United States."  Micron, 243 F.3d at 1305; see 19 C.F.R. § 351.412(c)(2) ("[Commerce] will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).").  The differences in selling functions performed in the U.S. and home markets must be "substantial" to qualify for a CEP offset.  19 C.F.R. § 351.412(c)(2) ("Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."); see also Sucocitrico Cutrale Ltda. v. United States, 2012 WL 2317764, at *6 (Ct. Int'l Trade 2012) ("Although Cutrale may perform more selling functions or may perform selling functions more intensely in its home market, these differences do not warrant a CEP offset. The CEP offset provision applies in situations in which there is a substantial difference in the level of trade." (citing Micron, 234 F.3d at 1305)) (Not Reported in F. Supp. 2d).

In short, Commerce will only grant a CEP offset where: (1) normal value is compared to CEP; (2) normal value is determined at a more advanced level of trade than the level of trade of the CEP; and (3) despite a company's cooperation to the best of its ability, whether the difference

in the level of trade affects price comparability cannot be determined based on available data.  19

C.F.R. § 351.412(f).

## II.      Factual Background

On August 11, 2015, domestic steel producers AK Steel Corporation, ArcelorMittal USA

LLC, Nucor Corporation, SSAB Enterprises, Steel Dynamics, Inc., and United States Steel

Corporation -- the defendant-intervenors in this action -- filed an antidumping duty petition with

Commerce, concerning imports of certain hot-rolled steel flat products (hot-rolled steel) from

Korea.  On September 9, 2015, Commerce initiated an antidumping duty investigation concerning

certain hot-rolled steel flat products.  Certain Hot-Rolled Steel Flat Products from Australia,

Brazil, Japan, the Republic of Korea, the Netherlands, and the Republic of Turkey: Initiation of

Less-Then-Fair-Value Investigations, 80 Fed. Reg. 54,261 (Dep't Commerce Sept. 9, 2015).  The

Period of Investigation ("POI") was July 1, 2014, through June 30, 2015.  Id. at 54,262.  On

October 1, 2015, Commerce issued a memorandum stating that it had selected Hyundai Steel as

one of the mandatory respondents in the investigation based on its volume of subject imports over

the POI, pursuant to 19 U.S.C. § 1677f-1(c)(2). [6]  See Respondent Selection Memorandum (Oct.

1, 2015), P.R. 75, C.R. 25.

---

[6] In antidumping duty investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—
>
> > (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

On October 5, 2015, Commerce issued an antidumping duty questionnaire to Hyundai, and Hyundai provided its responses to the questionnaire sections throughout that November.  See Antidumping Duty Questionnaire, P.R. 81; Section A Questionnaire Resp. (Nov. 2, 2015) ("Sec. A QR"), P.R. 110, C.R. 50; Sections B & C Questionnaire Resp. (Nov. 23, 2015) ("Sec. B-C QR"), P.R. 141, C.R. 98; Section D Questionnaire Resp. (Nov. 19, 2015) ("Sec. D QR"), P.R. 136, C.R. 76.  Commerce issued supplemental questionnaires between December 2015 and February 2016, to which Hyundai replied between January and March 2016.  See Commerce's Suppl. Questionnaire (Dec. 23, 2015), P.R. 165, C.R. 133; Hyundai's Sections A-C Suppl. Questionnaire Resp. (Jan. 20, 2016) ("Sec. A-C SQR"), P.R. 190, C.R. 209; Hyundai's Sections B & C Suppl. Questionnaire Resp. (Feb. 25, 2016) ("Sec. B-C SQR"), P.R. 240, C.R. 324.

On March 22, 2016, Commerce published its preliminary determination in the investigation.  Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 81 Fed. Reg. 15,228 (Dep't Commerce Mar. 22, 2016), and accompanying Preliminary Decision Memorandum, P.R. 253 ("PDM").  Commerce calculated a preliminary antidumping duty margin of 3.97 percent for Hyundai Steel.  PDM.

Prior to issuing a final determination, Commerce conducted sales, cost and further manufacturing verifications at the offices of Hyundai and certain of their United States affiliates during the months of January, April and June 2016.  Thus, from January 18 through January 29, 2016, Commerce verified Hyundai's responses with respect to cost.  See Cost Verification Report

---

(B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

(May 26, 2016), P.R. 278, C.R. 576.  From April 18 through April 22, 2016, Commerce conducted

a verification of Hyundai's home market and U.S. sales data, and from June 12 through June 15,

2016, Commerce conducted a verification of Hyundai's U.S. sales data.  See Sales Verification

Outline (Apr. 11, 2016), P.R. 266, C.R. 352; Sales Verification Report (July 5, 2016), P.R. 289,

C.R. 617.  During the second verification, Commerce requested contract information between

Hyundai's affiliated service providers and their unaffiliated customers.  See Sales Verification

Report at 13–15.  Hyundai was unable to supply this requested information.  Id.

On August 12, 2016, Commerce published the Final Results, in which it calculated a final

margin of 9.49 percent for Hyundai.  In the Final Results, Commerce applied AFA to Hyundai, on

the basis of Hyundai's inability to supply information regarding its affiliates' transactions with

unaffiliated parties, which Commerce requested at the June 2016 verification.  IDM at 18–20.

Specifically, Commerce verified that, of Hyundai's affiliated freight provider's[7] ("Freight

Affiliate") two largest shareholders, one shareholder is a part owner of Hyundai Steel and the other

shareholder is the Vice Chairman of Hyundai Steel.  IDM at 19.  Commerce further verified that

these two individuals are father and son.  Id.  Commerce noted that it performed a similar analysis

with regard to Hyundai's affiliated insurance provider[8] ("Insurance Affiliate") and found that

Hyundai and that company were affiliated.  Id.  Thus, Commerce found, "as confirmed at

verification, that Hyundai Steel and the affiliated companies were held and commonly controlled

by the same family members during the POI."  Id.  Commerce also found "that Hyundai Steel

failed the completeness portion at verification with regard to this issue, i.e., failed to demonstrate

---

[7] Hyundai's Freight Affiliate is named [[                    ]].

[8] Hyundai's Insurance Affiliate is named [[                              ]].

the arm's-length nature of these services provided by the affiliated companies. Accordingly, we find that we are unable to determine the arm's-length nature of transactions provided by these affiliates." IDM at 19. Commerce therefore concluded that "the necessary information to make this determination is not on the record due to Hyundai Steel's failure to provide it," and thus resorted to facts otherwise available under 19 U.S.C. § 1677e(a). Id. Furthermore, Commerce found that "Hyundai Steel failed to cooperate by not acting to the best of its ability to provide this requested information," and thus applied AFA under 19 U.S.C. § 1677e(b) to these transactions. Commerce applied AFA in the following manner:

> For the final determination, we will apply AFA to Hyundai Steel's home market inland freight, home market warehousing expenses, international freight, marine insurance, and domestic inland freight for U.S. sales. For home market inland freight and warehousing, we will apply Hyundai Steel's lowest reported values for its home inland freight and warehousing fields for the final determination. For marine insurance and international freight (including wharfage), we will apply the highest reported values for the final determination. For domestic inland freight for U.S. sales, we have selected the highest value as AFA.

IDM at 19.

Commerce also denied Hyundai a statutory CEP offset to adjust for differences between levels of trade in its home market and U.S. sales. IDM at 24–26. Commerce found that Hyundai had performed selling functions at virtually the same level of intensity in the U.S and home markets, and thus that no level of trade difference existed that merited a CEP offset. Id.

Commerce issued the corresponding antidumping duty order on October 3, 2016. Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders, 81 Fed. Reg. 67,962 (Dep't of Commerce Oct. 3, 2016). Hyundai

commenced this action on November 2, 2016, and filed its complaint on December 2.  Summons,

ECF No. 1; Compl., ECF No. 9.  Hyundai filed its motion for judgment on the agency record on

May 2, 2017, and its final motion for judgment on the agency record the next day.  ECF Nos. 45–

47 ("Pl.'s Br.").  The Government filed its responsive brief in opposition to Hyundai's motion on

August 2, 2017.   ECF Nos. 53–54 ("Def.'s Br.").   Defendant-intervenors filed their joint

responsive brief in opposition to Hyundai's motion on the same day.  ECF Nos. 51–52 ("Def.-

Inter.'s Br.").  Hyundai filed its reply brief on October 2, 2017.  ECF No. 55 ("Pl.'s Reply").  Oral

argument was held before the court on December 11, 2017.  ECF No. 64.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).  The standard of review in this action is set forth in 19

U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."

## DISCUSSION

### I. Commerce's AFA Application

Hyundai's argument that Commerce's application of AFA was unsupported by substantial

evidence and contrary to law is essentially tripartite.  Hyundai argues (1) that Commerce's

determination to apply AFA with respect to transactions with its affiliated service providers was

contrary to law; (2) that the record regardless confirms that Hyundai's transactions with those

affiliates were made on an arm's-length basis; and (3) that Commerce's AFA adjustments were

inconsistent with Hyundai's verified questionnaire responses.

*A.  Commerce's Determination to Apply AFA with Respect to Transactions with Hyundai's Affiliated Service Providers was Supported by Substantial Evidence and in Accordance with Law.*

Hyundai argues that Commerce's finding that Hyundai did not cooperate to the best of its ability, per 19 U.S.C. § 1677e(b), was contrary to law because Hyundai provided all requested information during the fact-gathering phase of the investigation,[9] and generally cooperated to the best of its ability at each of the three verifications conducted by the agency.  Pl.'s Br. at 12. Hyundai asserts that Commerce "never requested information regarding its service providers' sales prices to unaffiliated customers prior to the very last verification," and that Commerce's Sales Verification Outline did not signal that Commerce would reopen the record to request additional sales contracts information from Hyundai's affiliates.  Pl.'s Br. at 12 (emphasis added).  Hyundai notes that Commerce did, in fact, request that same information from Hyundai in the separate investigation involving cold-rolled steel flat products from Korea.  IDM at 18 (citing Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 49953 (July 28, 2016)).  However, Hyundai argues, that proceeding is irrelevant because Commerce there made its request during the questionnaire phase of the proceeding; further, Hyundai indicated in that proceeding that it had been unable to obtain the same data.  Pl.'s Br. at 13.

---

[9] In response to Commerce's Supplemental Questionnaire request for additional documentation regarding the arm's-length nature of its affiliates' transactions, Hyundai provided the freight contract between the Freight Affiliate and one of its subcontractors, [[                    ]], Sec. A-C SQR at Ex. S-38, a worksheet comparing the freight charged by the Freight Affiliate and the freight charged by its subcontractor, id. at Ex. S-56, the ocean freight contract between the Freight Affiliate and another of its sub-contractors, [[          ]], id. at S-59, and invoices billed to Hyundai Steel by the Freight Affiliate and the invoice billed to the Freight Affiliate by its sub-contractor, id. at Ex. S-60.

Hyundai characterizes Commerce's verification-phase request as an ultra vires expansion of the scope of verification in a manner contrary to its purpose, asserting that "[n]owhere in the procedural framework for AFA . . . does the statute or this Court's (or the Federal Circuit's) precedent allow for assessing AFA based on data that were never requested in Commerce's questionnaire or subsequent supplemental questionnaires." Pl.'s Br. at 14. Rather, "the purpose of verification is to verify the accuracy of the information already on the record, not to continue the information-gathering stage of the Department's investigation." Pl.'s Br. at 14 (quoting Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 39 CIT ___, ____, 61 F. Supp. 3d 1306, 1349 (2015)). Hyundai argues that here, the agency's conduct did nothing to "promote cooperation or accuracy or reasonable disclosure by cooperating parties." Bowe Passat v. United States, 17 CIT 335, 343 (1993) (Not Reported in F. Supp.). In sum, Hyundai argues that it did in fact cooperate to the best of its ability by doing the maximum it was able to do under the circumstances, and thus the application of AFA per 19 U.S.C. § 1677e(b) was unwarranted. Pl.'s Br. at 14–15.

The court first considers Commerce's decision to resort to facts otherwise available under 19 U.S.C. § 1677e(a) and finds that it was supported by substantial evidence.[10] As has been noted, supra pp. 4-5, under the statute, Commerce shall use the facts otherwise available in reaching its

---

[10] Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)).

final determination if necessary information is not available on the record, or, relevantly, an

interested party either withholds information that has been request by Commerce or fails to provide

such information by the deadlines for submission.  19 U.S.C. § 1677e(a)(1), (2)(A), (2)(B).  Here,

Commerce stated that "the necessary information to make [the arm's-length] determination is not

on the record due to Hyundai Steel's failure to provide it." IDM at 19.  Commerce had previously

requested in its Supplemental Questionnaire freight contracts between Hyundai's affiliates and all

unaffiliated freight providers during the POI for freight and warehousing services in both the U.S.

and home market.  Supplemental Questionnaire at 16–17, 22–23, 25.  Hyundai provided what it

characterized as representative examples of various transactions between Hyundai, its affiliates,

and unaffiliated parties, but did not furnish in entirety the documents requested by Commerce.

Sec. A-C SQR at 31–33, 43–48, Exs. S-38, S-56, S-59, S-60.  Finding that information insufficient

for the purposes of its arm's-length determination, Commerce at verification again requested

freight and insurance documentation between Hyundai, its affiliates, and other unaffiliated parties.

IDM at 18; Sales Verification Report at 14–15.  Commerce explained that this documentation

would be used in its sales-trace procedure, which it utilizes to trace the selected sale from initial

inquiry and order through a company's records to receipt of payment from the Customer.   Sales

Verification Report at 14–15; Sales Verification Outline at 9–10.  Hyundai did not provide this

documentation, instead proffering rates charged by unaffiliated service providers.  Hyundai hoped

to establish, by way of price comparison, the arm's-length nature of its transactions with its

affiliates. IDM at 18; Sales Verification Report at 14–15.  However, having asked for information

of great volume and different variety, and in light of the agency's discretion under the statute, see

infra, Commerce reasonably found that Hyundai's alternate submissions were insufficient, and

that the arm's-length transaction analysis could not be completed without the information that

Commerce had requested. IDM at 19. Accordingly Commerce's resort to facts otherwise available per 19 U.S.C. § 1677e(a) in order to complete its analysis was reasonable.

The court next considers Commerce's decision to apply AFA under 19 U.S.C. § 1677e(b) with respect to Hyundai's Steel's transactions with its Freight Affiliate and Insurance Affiliate. "If [Commerce] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], [then Commerce] . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A); see 19 C.F.R. § 351.308; QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (discussing burdens of proof in administrative proceedings before Commerce). Commerce "may employ [such] inferences . . . to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Viet I–Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1109 (Fed. Cir. 2016) (quoting SAA at 870). "Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." Maverick Tube, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (quoting Essar Steel Ltd. v. United States, 678 F.3d 1268, 1276 (Fed. Cir. 2012)). Thus, "[t]he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation." Id. (quoting F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum efforts to provide Commerce with full and complete answers to all inquiries in an investigation." Id. (quoting Nippon Steel, 337 F.3d at 1382) (emphasis added).

The procedural background here requires the court to consider the extent of Hyundai's ability to comply with Commerce's request for documentation between its affiliates and

unaffiliated parties.  Commerce found that "Hyundai Steel and the affiliated companies were held

and commonly controlled by the same family members during the POI," to wit, by a "group"

possessing "the ability to directly or indirectly control its group members."  IDM at 19; see 19

U.S.C. § 1677(33); see also Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330,

1336 (Fed. Cir. 2002).   "[A] person shall be considered to control another person if the person is

legally or operationally in a position to exercise restraint or direction over the other person."  19

U.S.C. § 1677(33).  Pertinently, the agency verified that of the Freight Affiliate's two largest

shareholders, one is part owner of Hyundai and the other is the Vice Chairman of Hyundai Steel;

these individuals are father and son, respectively.  IDM at 19.  Commerce made a similar finding

regarding the cross-ownership, by family members, of Hyundai and its Insurance Affiliate.  Id.;

Sales Verification Report at 15.  Hyundai does not dispute these findings in the instant proceeding.

See Pl.'s Br.  Commerce's factual determination that the overarching "group" possesses "the

ability to directly or indirectly control" its members, including Hyundai, its Freight Affiliate, and

its Insurance Affiliate, is supported by substantial evidence.

Given Commerce's finding that these entities were under common control, the agency

reasonably expected that Hyundai would be able to access its affiliates' documentation.  IDM at

19.  While "[t]he best-of-one's-ability standard 'does not require perfection and recognizes that

mistakes sometimes occur," it "does not condone inattentiveness, carelessness, or inadequate

record keeping."  Papierfabrik Aug. Koehler SE v. United States, 843 F.3d 1373, 1379 (Fed. Cir.

2016) (quoting Nippon Steel, 337 F.3d at 1382).  The record does not disclose that Hyundai

attempted to collect the information requested by Commerce at verification nor that Hyundai

requested additional time during which to acquire that information.  IDM at 18; Sales Verification

Report at 14–15.  Rather, per Commerce, "Hyundai Steel stated that despite the ownership,

managerial, and familial affiliations between [Hyundai and its Freight Affiliate], it was not within

the Hyundai's Steel's [sic] capability to obtain the requested data."  Sales Verification Report at

14.  The court emphasizes that Hyundai does not challenge Commerce's findings regarding

common control, see 19 U.S.C. 1677(33), and that the record contains no explanation for

Hyundai's purported inability to gather the requested information, or the nature of Hyundai's

attempts to acquire it during this proceeding.  Without further explanation of its alleged inability

to acquire the requested information, Hyundai cannot be said to have put forth its "maximum

efforts" in responding to Commerce's request.  Compare Maverick Tube, 857 F.3d at 1361 ("[The

respondent] effectively concedes that it possessed information necessary to Commerce's

investigation, that Commerce requested that information, and that [the respondent] did not provide

that information. Such behavior cannot be considered 'maximum effort to provide Commerce with

full and complete answers.'").

Hyundai's submissions in lieu of the requested information, see Sales Verification Report

at 14–15, do not cure Hyundai's failure to act to the best of its ability in responding to Commerce's

request.  Commerce possesses wide latitude over verification procedures, Micron Tech., Inc. v.

United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997), including its informational requests.  Further,

"the burden of creating an adequate record lies with interested parties and not with Commerce."

Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016).  "The placement of

the burden on interested parties stems from the fact that [Commerce] has no subpoena power."  Id.

Accordingly the court is not persuaded that a respondent's submission of substitute information

constitutes its "maximum efforts" to comply where the respondent has not offered an adequate

explanation for its inability to comply with Commerce's primary request for information.  IDM at

18–19; Sales Verification Report at 14–15; compare Husteel v. United States, 39 CIT ___, ___, 98

F. Supp. 3d 1315, 1361 (2015) ("Failing to provide data requested by Commerce is not the same as being unable to provide the requested data and providing a reasonable alternative.").

The court is further unpersuaded by Hyundai's arguments that it was not on notice that Commerce could request information regarding its affiliates' transactions with unaffiliated customers. Hyundai was aware from Commerce's questionnaires, Sales Verification Outline, and the overarching scheme to determine whether Hyundai's transactions with its affiliates were made at arm's length -- and therefore comparable to transactions with unaffiliated parties, per 19 C.F.R. §§ 351.402(e), 351.403[11] -- that Commerce required information regarding Hyundai's affiliates and the affiliates' service providers. As a preliminary point, and as explained supra, Commerce's determination that Hyundai's controlling group wielded the ability to directly or indirectly control Hyundai's affiliates was supported by substantial record evidence. More substantively, the record demonstrates that Commerce did place Hyundai on notice that its affiliates' contractual documentation could be subject to verification. Indeed, Commerce signaled from the beginning of the proceeding that Hyundai's relationship with its affiliates was subject to scrutiny pursuant to the arm's-length transaction analysis. See Initial Questionnaire; compare Ta Chen, 298 F.3d at 1336. In its Section A, B, and C questionnaires, Commerce requested, and Hyundai provided, information about the nature of Hyundai's affiliates and their ownership. Sec. A QR at A-10-13; Sec. B-C QR at B-28-31, C-26-28, C-30-31. Commerce later in the Supplemental Questionnaire requested freight contracts between Hyundai's affiliates and all unaffiliated freight providers during the POI for freight and warehousing services in both the U.S. and home market.

---

[11] 19 C.F.R. § 351.403 "clarifies the authority of [Commerce] to use sales to or through an affiliated party as a basis for normal value."

Supplemental Questionnaire at 16–17, 22–23, 25.  Commerce instructed Hyundai to "[r]eview the

nature of any affiliations between Hyundai Steel and other companies, including, but not limited

to, all suppliers and customers, as reported in your submissions," and to "[i]dentify the

shareholders and officers in Hyundai Steel and every affiliated company involved in the production

and sale of hot-rolled steel."  Sales Verification Outline at 6.  Pursuant to its sales-trace procedure,

Commerce instructed Hyundai to "incorporate affiliated party documents in the sales trace

package" if an affiliated party is involved in the chain of distribution for a specific sales

transaction.  Id. at 9–10.  Further, Commerce explicitly characterized its Sales Verification Outline

as "not necessarily all inclusive" and "reserve[d] the right to request any additional information or

materials necessary for a complete verification."  Id. at 1.  Commerce's regulation covering

verification procedures, 19 C.F.R. § 351.307, likewise places respondents on notice that

Commerce will request access to all files, records, and personnel relevant to the submitted factual

information concerning (1) producers, exporters, or importers; (2) persons affiliated with those

producers, exporters, or importers; or (3) unaffiliated purchasers.  19 C.F.R. § 351.307(d).

Similarly, the court is not persuaded by Hyundai's use of the proposition that "[t]he purpose

of verification is to verify the accuracy of information already on the record, not to continue the

information-gathering stage of [Commerce's] investigation."  Pl.'s Br. at 14 (quoting Borusan, 61

F. Supp. 3d at 1350 (quoting Certain Oil Country Tubular Goods From the Republic of Turkey,

79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) (final affirmative countervailing duty

determination), accompanying IDM ("COTG IDM") at 55)).  That citation iterates Commerce's

position that "parties may not submit new factual information at verification under the deadlines

in 19 C.F.R 351.301."[12]   Borusan, 61 F. Supp. 3d at 1349 (quoting COTG IDM at 55) (emphasis

added).   Commerce, by contrast, possesses considerable latitude in the formation and application

of its verification procedures, and is authorized to request the submission of factual information

"at any time during a proceeding."   19 C.F.R. § 351.301(a); see Micron, 117 F.3d at 1396

("Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad

hoc.").

        Hyundai additionally argues that Commerce ignored its statutory procedural requirements

under 19 U.S.C. § 1677m(d),[13] which requires the agency to provide a respondent "an opportunity

---

[12] 19 C.F.R. § 351.301 prescribes time limits for submission of factual information to Commerce
during antidumping and countervailing duty proceedings.  It provides, in relevant part:

> The Department obtains most of its factual information in
> antidumping and countervailing duty proceedings from submissions
> made by interested parties during the course of the proceeding.
> Notwithstanding paragraph (b) of this section, the Secretary may
> request any person to submit factual information at any time during
> a proceeding or provide additional opportunities to submit factual
> information.

[13] 19 U.S.C. § 1677m(d) provides, in relevant part:

> If [Commerce] determines that a response to a request for
> information under this subtitle does not comply with the request,
> [Commerce] shall promptly inform the person submitting the
> response of the nature of the deficiency and shall, to the extent
> practicable, provide that person with an opportunity to remedy or
> explain the deficiency in light of the time limits established for the
> completion of investigations or reviews under this subtitle. If that
> person submits further information in response to such deficiency
> and either—
>
> > (1) [Commerce] finds that such response is not satisfactory,
> > or
> > (2) such response is not submitted within the applicable time
> > limits,

to remedy or explain" any alleged deficiency in its informational submissions in light of impending statutory or regulatory deadlines.   Pl.'s Br. at 11; Pl.'s Reply at 6–8.   Hyundai asserts that Commerce here arranged its AFA determination as a trap, wherein the agency did not request the affiliates' information until verification, yet found an adverse inference warranted due to an alleged reporting error attributable to Hyundai's questionnaire responses.

Hyundai's arguments do not persuade the court that Commerce was statutorily required by 19 U.S.C. § 1677m(d) to take additional actions in the underlying investigation.   If Commerce "determines that a response to a request for information under this subtitle does not comply with the request," then it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established."   19 U.S.C. § 1677m(d).   Here, as has been noted, Commerce, in issuing its supplemental questionnaire to Hyundai, specifically stated that it had "reviewed [Hyundai's] responses to [the previous questionnaires] and ha[d] identified certain areas which require additional information, as detailed in the enclosed supplemental questionnaire."   The Supplemental Questionnaire explicitly requested documents regarding Hyundai's affiliates.   Supplemental Questionnaire at 16–17, 22–23, 25.   The Supplemental Questionnaire thereby did provide Hyundai an opportunity to cure purported deficiencies in satisfaction of the highlighted statutory safeguards.   See Maverick Tube, 857 F.3d at 1361 ("[The respondent] had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified [the respondent] of that defect.

---

then [Commerce] may, subject to subsection (e) of this section, disregard all or part of the original and subsequent responses.

§ 1677m(d) does not require more.").   However, Hyundai's SQR did not fully comply with

Commerce's requests for additional documentation, providing instead individual contracts that it

characterized as representative samples.  Sec. A-C SQR at 31–33, 43–48, Exs. S-38, S-56, S-59,

S-60.  As explained supra, Commerce had adequately noticed Hyundai that it was investigating

the activities of the company's affiliates for the purposes of its arm's-length determination.  Upon

reviewing the cross-ownership between Hyundai and its affiliates at verification, Commerce

found, with the support of substantial evidence, that they operated under common "group" control

pursuant to 19 U.S.C. § 1677(33).  IDM at 18–19.  Commerce thus reasonably requested during

verification access to the affiliates' documentation, which Hyundai asserted it could not provide.

Commerce was not obligated to provide Hyundai with additional safeguards under 19 U.S.C. §

1677m(d).

> **B.**     *Commerce's Determination that the Transactions were not Made on an Arm's-Length Basis is Supported by Substantial Evidence.*

Hyundai also argues that Commerce's determination that Hyundai had "failed to

demonstrate the arm's-length nature" of the services provided by its affiliates, IDM at 19–20, was

unsupported by the evidence in the record, which instead supports the opposite conclusion.  Pl.'s

Br. at 15.

As to home market inland freight expenses, home market warehousing expenses, and

domestic inland freight expenses for export, Hyundai argues that the materials it provided to

Commerce -- ostensibly demonstrating that the price the Freight Affiliate charged to Hyundai was

greater than the cost the Freight Affiliate incurred for procuring the freight service from an

unaffiliated provider, Sec. A-C SQR at Ex. S-56 -- were the same materials Commerce requested

from Hyundai to demonstrate that the services were provided on an arm's-length basis.  Pl.'s Br.

at 15.  Hyundai states that these materials were sufficient for Commerce to conclude that the

services were provided on an arm's-length basis in the Preliminary Results.  Id.

Regarding international freight expenses, Hyundai asserts it demonstrated both that its

Freight Affiliate passed on the full costs of its services to Hyundai, Sec. A-C SQR at 48, Exs. S-

59–61, and that Hyundai was charged comparably for the same services by an unaffiliated service

provider.  Pl.'s Br. at 16–17 (citing Sales Verification Report at 10; Sales Verification Exhibits at

Ex. 27).

Finally, as to marine insurance, Hyundai asserts that Commerce verified the expenses

charged by the Insurance Affiliate were arm's-length because the prices charged by an unaffiliated

provider were comparatively lower.  Pl.'s Br. at 16 (citing Sales Verification Report at 15, 21).

The court is not persuaded by Hyundai's argument that the documentation it provided to

Commerce necessarily constituted the record evidence required for Commerce to complete its

arm's-length determination.  Assuming *arguendo* that Hyundai's submissions could support the

conclusion that the transactions at issue were made on an arm's-length basis, "the possibility of

drawing two inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence."  Matsushita Elec. Indus. Co. v.

United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S.

607, 619–20 (1966)).

It is also true that "[t]he substantiality of evidence must take into account whatever in the

record fairly detracts from its weight."  CS Wind, 832 F.3d at 1373.  Further, in the context of

Commerce's execution of its statutory mandates, "reviewing courts must accord deference to the

agency in its selection and development of proper methodologies."  Thai Pineapple Pub. Co. v.

United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (citing Daewoo Elecs. Co. v. Int'l Union of

Elec. Elec., Tech., Salaried & Mach. Workers, AFL–CIO, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).

Here, Commerce acknowledged Hyundai's submission of its supportive materials, and reasonably

concluded that they did not constitute substantial record evidence that would necessitate Hyundai's

preferred conclusion, or permit the completion of the arm's-length analysis pursuant to 19 U.S.C.

§ 1677b(f)(2).  Sales Verification Report at 14–15.  Indeed, Hyundai's submissions did not meet

the extent of materials requested by Commerce in the Supplemental Questionnaire at 16–17, 22–

23, 25.  As has been noted, at verification Commerce requested freight and insurance

documentation between Hyundai's affiliates and other unaffiliated parties for the purpose of

verifying Hyundai's submitted factual information as it relates to the arm's-length nature of the

relevant affiliate transactions.  IDM at 18.  In sum, the court finds reasonable and supported by

substantial evidence Commerce's determination that Hyundai's purportedly representative

contractual information did not permit a complete arm's-length analysis.

*C.  Commerce's AFA Adjustments were Made in Accordance with Law.*

Hyundai argues that Commerce's AFA adjustments themselves were inconsistent with its

verified questionnaire responses, and thus unreasonable.[14]  Pl.'s Br. at 18.

Regarding international freight expenses, Hyundai takes issue with Commerce's

application of "the highest transaction value . . . to all transactions as an AFA adjustment,"

including those between Hyundai and an unaffiliated provider, rather than to only those

transactions between Hyundai and its affiliated provider.  Pl.'s Br. at 19 (citing IDM at 18–21)

---

[14] As to marine insurance expenses, Hyundai argues that it demonstrated, and that Commerce confirmed at verification, that these expenses were on an arm's-length basis, specifically because the rate charged by the Insurance Affiliate exceeded the insurance premium rate charged to Hyundai by an unaffiliated provider.  Pl.'s Br. at 18–19.  The court, however, reiterates that Commerce's determination regarding the arm's-length nature of Hyundai Steel's transactions was supported by substantial evidence, as discussed supra.

(emphasis added).   Similarly, regarding domestic inland freight to port, Hyundai argues that

Commerce erroneously applied an AFA adjustment to sales for which Hyundai had used an

unaffiliated freight provider.[15]   Pl.'s Br. at 20–21 (citing IDM at 19; Sales Verification Report at

20; Sales Verification Exhibits at Exs. 25, 26, 29).

Finally, regarding home market inland freight, Hyundai argues that Commerce was

incorrect to apply, as an AFA adjustment, the absolute lowest reported amount for inland freight

to the warehouse and inland freight to the customer, where the reported amount was greater than

zero, regardless of destination.   Pl.'s Br. at 21 (citing Final Determination Calculation

Memorandum at 2–3).   Specifically, Hyundai argues that Commerce improperly decreased the

reported expense for home market sales, while increasing expenses for U.S. sales.   Id.   Rather,

Hyundai asserts, Commerce should have applied the same upwards adjustment, in both markets,

to all related expenses from a given provider.   Pl.'s Br. at 21–22.   Hyundai further argues that

Commerce erred by using the absolute lowest reported amount as an AFA adjustment, rather than

using the lower amount relevant to a given destination.   Pl.'s Br. at 22.   Per Hyundai, this broad

application of the same low value to transactions with freight expenses that logically vary based

on destination runs counter to the ostensible purpose of adjusting towards an arm's-length expense.

Pl.'s Br. at 22.

The court is satisfied that Commerce acted in accordance with law in utilizing AFA for its

arm's-length adjustments in the manner it did.   Generally, "Commerce has wide, though not

unbounded, discretion 'to select adverse facts that will create the proper deterrent to non-

cooperation with its investigations and assure a reasonable margin.'"   Papierfabrik, 843 F.3d at

---

[15] This unaffiliated freight provider is named [[      ]].

1380 (quoting <u>De Cecco</u>, 216 F.3d at 1032).  That discretion is bounded by the relevant statutory

framework.

Pursuant to 19 U.S.C. § 1677b(f)(2), Commerce may adjust various expenses incurred for

inputs or services provided by affiliates in the dumping margin calculation to reflect market values,

if necessary.  <u>See</u> 19 C.F.R. §§ 351.402(e), 351.403.  As has been noted, <u>supra</u> pp. 4-5, after finding

that a respondent has failed to cooperate by not acting to the best of its ability to comply with a

request for information, Commerce "may use an inference that is adverse to the interests of that

party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b)(1)(A).  Under

the adverse facts available framework, Commerce's decision to apply, as adverse inferences, the

highest values to the expenses incurred in the U.S. market, and the lowest values to expenses

incurred in the home market, was reasonable and in accordance with law.  As described <u>supra</u>,

Commerce's determination that it did not possess sufficient record evidence to complete its arm's-

length analyses was supportable.  The agency thus reasonably resorted to facts otherwise available

per 19 U.S.C. § 1677e(a), and ultimately AFA pursuant to § 1677e(b), upon determining that

Hyundai did not act to the best of its ability in responding to Commerce's request for certain

information.  Here, Commerce determined that Hyundai failed to satisfy the completeness part of

verification with regard to international freight and inland freight, and properly applied AFA

adjustments to those categories of transactions.[16]  Sales Verification Report at 14–15; <u>IDM</u> at 19.

---

[16] Regarding Hyundai's arguments that Commerce's application of AFA adjustments to transactions with unaffiliated service providers was improper, the court notes that Hyundai did not fully develop the record.  As to domestic inland freight, Hyundai did not provide Commerce with information that would have allowed the agency to determine which vendor provided inland freight services on a sale-by-sale basis.  As to international freight, Commerce noted that "[w]hile the company had reported [[          ]] as a subcontractor for [[          ]], we observed that based on the documentation for this transaction, [[          ]] itself was the ocean freight provider."  Sales Verification Report at 21.

Further, Commerce was not required to demonstrate that the application of AFA "reflect[ed] an alleged commercial reality" of Hyundai. 19 U.S.C. § 1677e(d)(3). The court therefore finds unpersuasive Hyundai's argument that home market inland freight expenses should have been adjusted, adverse inference notwithstanding, in reflection of the relativity of expenses among freight to different locations. Commerce's AFA application and execution of the arm's-length adjustments pursuant to 19 U.S.C. §§ 1677e, 1677b, respectively, were thus reasonable and in accordance with law.

## II. CEP Offset

Hyundai contends that Commerce's determination that Hyundai Steel did not qualify for a CEP offset (1) was not supported by substantial evidence on the record and (2) was arbitrary and capricious because Commerce had granted Hyundai CEP offsets in proceedings involving different but similarly distributed products. Pl.'s Br. at 22; Pl.'s Reply at 12–13. The court is not persuaded by Hyundai's arguments.

### A. Commerce's Denial of a CEP Offset Is Supported by Substantial Evidence.

Hyundai contends that Commerce's CEP offset denial was unsupported by substantial evidence because Hyundai's home market level of trade is more advanced than its U.S. level of trade. Pl.'s Br. at 22. As previously discussed, substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." Altx, 370 F.3d at 1116. "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube, 857 F.3d at 1359 (citing Consol. Edison, 305 U.S. at 229). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." CS Wind, 832 F.3d at 1373. This includes "contradictory evidence or evidence from

which conflicting inferences could be drawn." Suramerica, 44 F.3d at 985 (quoting Universal, 340

U.S. at 487).

In Hyundai's view, the record established that Hyundai Steel performed significantly less

selling activities related to its U.S. affiliates than its unaffiliated home market customers in all four

categories of selling activities that Commerce usually considers in its CEP offset analysis: (1) sales

and marketing activities; (2) freight and delivery; (3) inventory and warehousing; and (4) warranty

and technical support.  Pl.'s Br. at 23; IDM at 24; see, e.g., Certain Orange Juice from Brazil, 75

Fed. Reg. 50,999 (Dep't of Commerce Aug. 18, 2010) and accompanying IDM at cmt. 7 (dividing

selling functions into the four categories).

Regarding (1) sales and marketing activities, Hyundai argues that, although it "plays a

supporting role to its [U.S.] affiliates," Hyundai alone performs these activities in its very large

and profitable home market and thus performs them to a greater degree in its home market.  Pl.'s

Br. at 24; HCUSA CEP Sales Verification Exhibits at Exhibit 10, P.R. 275, C.R. 496; Sec. A QR

at Ex. A-1; Sec. B-C QR at Ex. B-9.  With respect to (2) freight and delivery activities, Hyundai

acknowledges that Hyundai delivered its products to both the home market and the U.S. market,

but that the volume of home market shipments, variation in shipment quantity, and number of

home market customers indicate that it performed this function at a more intense level in its home

market.  Pl.'s Br. at 25.  As for (3) inventory and warehousing, Hyundai states that it incurred

warehousing expenses for some home market sales but for no U.S. sales, and argues that this

selling function was thus performed to a greater degree in its home market.  Pl.'s Br. at 25; Sec.

B-C QR at Ex. B-29, Ex. C-31.  Finally, regarding (4) warranty and technical support, Hyundai

contends that although it guarantees its products in all markets, it only manages and incurs

warranty expenses in its home market, which Hyundai argues establishes that the warranty

function was performed at different levels of trade in the U.S. and home markets.  Pl.'s Br. 25;
Sec. B-C QR at Ex. C-38.

    The court is not persuaded that Commerce's determination is unsupported by substantial
evidence.  Although Hyundai argues that its home market's significantly greater size -- and
accompanying greater number of customers and sales transactions -- means that its home market
is at a more advanced level of trade with regards to category (1), sales and marketing activities,
these factors do not have an impact on the type of selling functions performed or the level of
intensity of those selling functions in a market.  See Antifriction Bearings (Other Than Tapered
Roller Bearings) and Parts Thereof From France, et al., 60 Fed. Reg. 10,900, 10,940–41 (Dep't of
Commerce Feb. 28, 1995) (final administrative review) ("[N]umber of sales to customers at a
given level of trade is irrelevant to rendering determinations regarding the existence of distinct
levels of trade"); Furfuryl Alcohol From the Republic of South Africa, 63 Fed. Reg. 11,209, 11,211
(Dep't Commerce Mar. 6, 1998) (preliminary administrative review) ("[O]ur examination is not
contingent on the number of customers nor on the number of sales for which the activity is
performed.").

    Regarding category (2), freight and delivery, Hyundai stated in the administrative record
that "Hyundai is responsible for arranging the entire freight service process for both the U.S. and
home market sales" and reported a "high degree of activity for freight services in both the U.S.
and home market sales," which supports Commerce's finding that this category of selling functions
was performed at the same level of trade in both markets.  Sec. A-C SQR at 9.  Further, as explained
above, the number of customers or transactions are not taken into account as part of the level of
trade analysis.  See Furfuryl Alcohol, 63 Fed. Reg. at 11,211.

Regarding category (3), inventory and warehousing and category (4), warranty and technical support, Hyundai's claims that it incurred greater warehousing and warranty expenses in its home market are not sufficient to render Commerce's denial unsupported by substantial evidence.  First, Hyundai reported more intense involvement with the warranty selling function in the U.S. market than the home market.  Sec. A QR at Ex. A-13.  More importantly, the minor differences in these categories Hyundai emphasizes are not enough to merit a CEP offset: "[a]lthough [an importer] may perform more selling functions or may perform selling functions more intensely in its home market, these differences do not warrant a CEP offset.  The CEP offset provision applies in situations in which there is a substantial difference in the level of trade." Sucocitrico Cutrale, 2012 WL 2317764, at *6 (citing Micron, 234 F.3d at 1305).  Minor differences are inadequate; the variation in selling functions must be substantial, "such as the difference between wholesale and retail," to merit a CEP offset.  Id.; see 19 C.F.R. § 351.402(c)(2) ("Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.").

Commerce reasonably determined that the differences here were not substantial.  IDM at 25.  According to evidence in the record, overall, only two out of the sixteen selling functions -- cash discounts and direct guarantees -- provided in the home market were not provided in the U.S. market.  Id.  Further, according to the selling functions chart Hyundai placed on the record, it provided most services at the same level of intensity in both markets.  Sec. A QR at Ex. A-13. Even though Hyundai reported lower levels of intensity for some selling activities in the U.S. market, for about as many others, it reported higher levels of activity in the U.S. market.  Id.

This Court has found previously that Commerce reasonably determined that such minor

differences are not substantial enough to merit a CEP offset, and the court finds the underlying

reasoning persuasive here:

> Commerce determined that Cutrale performed seven common
> selling functions at a similar level of intensity in both its home and
> U.S. markets, with "relatively minor differences" between the levels
> in the two markets. See Gov't Br. at 27. Commerce also found that
> the one additional home market function Cutrale performed-
> advertising-was not significant. Although Commerce noted minor
> differences between the two markets, these differences do not rise
> to the level required by the statute, such as the difference between
> wholesale and retail. See Micron Tech., 234 F.3d at 1305. Thus,
> Commerce's factual determination that there is not a substantial
> difference in the levels of trade in the two markets is reasonable and
> supported by substantial evidence. Therefore, this Court upholds
> Commerce's decision that Cutrale is not entitled to a CEP offset.

Sucocitrico Cutrale, 2012 WL 2317764, at *6.

In light of the foregoing considerations, the court finds that Commerce's denial of the CEP

offset was supported by substantial evidence.

### B.   Commerce's CEP Offset Denial Was Not Arbitrary and Capricious.

"[A]n agency's finding may be supported by substantial evidence," yet "nonetheless reflect

arbitrary and capricious action." Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,

701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting Bowman Transp., Inc. v. Arkansas–Best Freight

Sys., Inc., 419 U.S. 281, 284 (1974)).  While "the substantial evidence standard applies to review

of factual determinations," where "we are evaluating the agency's reasoning . . . [we] review[ ]

under the arbitrary and capricious (or contrary to law) standard."  Id. (citing Motor Vehicle Mfrs.

Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983)); see Administrative Procedure

Act, 5 U.S.C. § 706(2)(A) (2012) (directing that the Court shall "hold unlawful and set aside

agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law.").  "[W]here the agency is vested with discretion to set

the procedure by which it administers its governing statute, the court reviews such decisions for

abuse of discretion . . . . In abuse of discretion review, 'an agency action is arbitrary when the

agency offers insufficient reasons for treating similar situations differently.'"  Jiangsu Jiasheng

Photovoltaic Tech. v. United States, 38 CIT ___, ___, 28 F. Supp. 3d 1317, 1323 (2014) (quoting

SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).

        Hyundai contends that Commerce's determination that Hyundai Steel did not qualify for a

CEP offset was arbitrary and capricious because Commerce had granted Hyundai CEP offsets in

proceedings involving different but similarly distributed products.   Pl.'s Reply at 12–13.

According to Hyundai, "Commerce provided no meaningful justification for reaching the opposite

conclusion regarding the same sales channels and similar products in" this case, and thus violated

the "fundamental principle of administrative law that '[w]hen an agency changes its practice, it is

obligated to provide an adequate explanation for the change.'"  Pl.'s Reply at 14–15 (quoting SKF

USA, Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011)).

        "While it is true that [a]n agency is obligated to follow precedent," Commerce retains

"discretion to . . . adapt its views and practices to the particular circumstances of the case at hand,

so long as the agency's decisions are explained and supported by substantial evidence on the

record."  M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Dep't

Commerce, 729 F.2d 748, 755 (Fed. Cir. 1984); Nakornthai Strip Mill Public Co. Ltd. v. United

States, 31 CIT 1272, 1276–77, 587 F. Supp. 2d 1303, 1307–08); see also Pakfood Pub. Co. v.

United States, 34 CIT 1122, 1135, 724 F. Supp. 2d 1327, 1343 (2010).  Hyundai took into account

the "particular circumstances of the case at hand" when reaching its decision, as discussed supra.

The other cases Hyundai mentions involve different products, markets, and time periods, and the

record before the court does not show how similar the selling functions Hyundai performed in those situations were to the selling functions Hyundai performed in this case.  The selling functions in those cases could well have differed from the functions Hyundai performed here, and thus Commerce could reasonably have come to a different conclusion about the applicability of a CEP offset in those cases based on the particular relevant facts.  Therefore, the court is not persuaded that Commerce's "opposite conclusions" in those cases mean that Commerce acted arbitrarily here.

Further, "[e]ven assuming Commerce's determinations at issue are factually identical, as a matter of law a prior administrative determination is not legally binding on other reviews before this court."  Alloy Piping Prod., Inc. v. United States, 33 CIT 349, 358–59 (2009) (rejecting the plaintiffs' contention that, because the facts were nearly identical in a previous administrative review and the review at issue, Commerce acted arbitrarily by denying a CEP offset in one review but granting it in the other (citing Timken U.S. Corp. v. United States, 434 F.3d 1345, 1352 (Fed. Cir. 2006))) (Not Reported in F. Supp. 2d).  Moreover, Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings.  See Pakfood, 724 F. Supp. 2d at 1345 (finding that "Commerce makes determinations based upon the record of the relevant segment of the proceeding, not previous segments, and [that] the record of this review supports Commerce's determination" in the third administrative review despite coming to the opposite conclusion in the first and second administrative reviews of the same antidumping duty order).  Thus, the court does not find that Commerce acted arbitrarily and capriciously in denying the CEP offset.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Commerce's <u>Final Results</u> are sustained.

**<u>So Ordered</u>.**

                                                        */s/   Gary S. Katzmann*
                                                        Gary S. Katzmann, Judge

Dated: <u>December 27, 2017   </u>
       New York, New York